IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case Nos. 16-cv-00081-LTB-MJW (Consolidated w/16-cv-00082-LTB-MJW)

In re:

DANE ANDERS NIELSEN and ADIA JANINE PAYSINGER
Debtors.

KEVIN DEAN HEUPEL and HEUPEL LAW, P.C.,

Appellants,

vs.

DANE ANDERS NIELSEN and
ADIA JANINE PAYSINGER,

Appellees.

_____

MEMORANDUM OPINION AND ORDER
_____

Babcock, J.

It is undisputed that Appellants Heupel Law and Kevin Heupel (collectively,

"Heupel") willfully violated the automatic stay provision of the Bankruptcy Code by

taking post-petition withdrawals from Appellees Dane Nielsen's and Adia

Paysinger's bank accounts.  The bankruptcy court awarded Mr. Nielsen and Ms.

Paysinger sanctions, including attorneys' fees and punitive damages, under 11

U.S.C. § 362(k).  Heupel appeals the award of sanctions, arguing: (1) the debtors

were not actually injured by the stay violation and were not entitled to any

damages; (2) because the debtors entered into contingency fee agreements with

their attorneys, they did not actually owe attorneys' fees and therefore could not collect them under § 362(k); (3) the fees awarded were excessive; (4) the court should not have awarded any attorneys' fees incurred after the stay violation ended; and (5) the punitive damages award was not appropriate.  Heupel also asks this Court to remand the case because the bankruptcy judge who initially presided over the case, Judge Brown, *sua sponte* recused herself from the case while this appeal was pending.

Because the facts and legal argument relevant to this appeal are adequately presented in the briefs and record, I decide this case without oral argument.  *See* Fed. R. Bankr. P. 8019(b)(3).  As I describe below, I discern no error in the bankruptcy court's decision.  I also decline to remand the case based on Judge Brown's *sua sponte* recusal.

Accordingly, I AFFIRM the bankruptcy judge's decision.  I also DENY as moot the debtors' Motion to Dismiss Appeal (ECF No. 14, Nielsen, No. 16-cv-00081-LTB; ECF No. 16, Paysinger No. 16-cv-00082-LTB).  I DENY the debtors' Motion to Correct the Record on Appeal (ECF No. 21, Nielsen, No. 16-cv-00081-LTB; ECF No. 23, Paysinger, No. 16-cv-00082-LTB).  I REMAND the case to the bankruptcy court for the limited purpose of awarding the debtors the reasonable attorneys' fees and costs incurred in defending this appeal under § 362(k).

## I. Background

Kevin Heupel is the sole shareholder of Heupel Law.  *See* Paysinger Bankruptcy Record ("BR") Vol. 3 at 286, ECF No. 10.  From 2008 to 2014, Heupel

Law filed more consumer bankruptcy cases than any other firm in the District of Colorado. *Id.* The firm's success was in large part because of the unconventional billing structure it used: the "zero down" bankruptcy filing program. Under this program, a client could hire Heupel Law without paying any up-front fees. 3 BR 286, 375. Instead, a client would sign an agreement to make payments through regular automatic bank or debit card withdrawals. *Id.* Heupel Law typically charged $2,500 for a chapter 7 case—an amount the bankruptcy court characterized as "significantly higher than the going rate" in this district. 3 BR 287.

The zero-down program required clients to sign a promissary note for the full fee and to begin making payments at or soon after the initial consultation. *Id.* The zero-down paperwork informed clients that nonpayment would result in a collection action. *Id.* Clients also signed an agreement to reaffirm the debt after the petition was filed. 2 BR 159. The reason for the reaffirmation agreement was plain: As the reaffirmation document itself explained, after filing the petition, the client's debt would otherwise be discharged. *See id.* The reaffirmation agreement itself was not as plain: It informed the client that reaffirmation was "voluntary" but also explained that Heupel Law was only willing to provide post-petition services "provided that" the client reaffirmed the debt. *Id.* Heupel Law also informed clients it would obtain court approval of the reaffirmation agreement. *Id.*

From January 2012 until June 2013, Heupel Law filed almost 600 zero-down chapter 7 cases. 3 BR 375. Initially, Heupel Law filed the reaffirmation agreements for court approval. 3 BR 287, 376. But as bankruptcy courts began to

3

deny them with increasing frequency, Heupel Law stopped filing them.  3 BR 287.

By October 2012, Heupel Law was no longer filing reaffirmation agreements in the

bankruptcy court, but it was continuing to collect post-petition fees.  *Id.*  Indeed,

even in cases where the court had denied the reaffirmation agreement, Heupel Law

continued to collect, or at least attempt to collect, fees.  3 BR 376.

Ms. Paysinger and Mr. Nielsen were typical "zero down" clients.  They had an

initial consultation with a non-attorney staff member, signed a note promising to

pay $2,500, signed up for automatic bank withdrawals, and signed the

reaffirmation agreement.  4 BR 83-84, 91-93, 123-24.  After Heupel Law filed their

chapter 7 petitions in December 2012, it did not file the reaffirmation agreements.

Nonetheless, Heupel Law continued to take automatic deductions after filing the

petition, taking a total of $400 from Mr. Nielsen and $661.77 from Ms. Paysinger.  3

BR 287.

In February 2013, Mr. Nielsen contacted Heupel Law because he needed

assistance defending against a motion for relief from the stay (i.e., a creditor was

attempting to collect payments post-filing).  4 BR 131-32.  Heupel Law agreed to

assist him, but only if he paid extra.  *Id.*  Unable to pay the additional fee, Mr.

Nielsen contacted Geoffrey Atzbach, a different bankruptcy attorney.  4 BR 133.

Mr. Atzbach reviewed his case and discovered that Heupel Law was taking post-

petition payments, which Mr. Atzbach believed was in violation of the Bankruptcy

Code.  Mr. Atzbach and his brother, Erik Atzbach, substituted in as counsel to

pursue the stay violation claims.  Because Mr. Nielsen and Ms. Paysinger are co-

4

workers, Mr. Nielsen advised Ms. Paysinger about the stay violation claims, and the Atzbachs also substituted in as counsel for her.  4 BR 94.

Even though it is their normal practice to contact a creditor who is in violation of stay and ask the creditor to cease its collections, the Atzbachs opted to file Motions for Orders to Show Cause in Mr. Nielsen's and Ms. Paysinger's cases without first contacting Heupel Law.  4 BR 166-67.  The Atzbachs filed the show cause motions on April 12, 2013.  Despite the pending show cause motions, Heupel Law continued to attempt to collect its fees from Mr. Nielsen, threatening to send his account into collections because Mr. Nielsen had closed his account and stopped the automatic payments.  4 BR 137.  Heupel Law took three more automatic debits from Ms. Paysinger's account before it voluntarily stopped taking withdrawals.  4 BR 168-67.

In its responses to the show cause motions, Heupel Law argued its failure to file the reaffirmation agreements was inadvertent and isolated.  1 BR 35-37. Heupel also argued that, as competitors of Heupel Law, the Atzbachs were trying to gain a competitive advantage by eliminating the zero-down program.  1 BR 37-38. Through counsel, Heupel later withdrew these motions in light of compelling evidence that failure to file the reaffirmation agreements was in fact a widespread and regular practice of Heupel Law.

In early 2013—around the same time the Atzbachs substituted in as counsel for Mr. Nielsen and Ms. Paysinger—the United States Trustee began investigating Heupel Law's billing and collection practices.  The trustee ultimately filed a lawsuit

in July 2013, shortly after Heupel Law voluntarily stopped its zero-down program and after the Atzbachs filed the show cause motions in Mr. Nielsen's and Ms. Paysinger's cases. *See* Complaint, *Layng et al. v. Heupel Law, PC.*, No. 13-0005-EEB (Bankr. D. Colo. filed July 11, 2013). The case was designated a "Miscellaneous Proceeding." *Id.* The complaint alleged that Heupel's compensation and fee collection practices violated the automatic stay, discharge injunction, and other provisions of the Bankruptcy Code. *See id.* The complaint also alleged that Heupel had failed to accurately disclose the terms of the client agreements. *Id.* It specifically named Mr. Nielsen and Ms. Paysinger as clients who had been damaged because of Heupel's practices. *Id.* The trustee asked the court to disgorge client fees, enjoin Mr. Heupel from practicing bankruptcy law, and declare that his practices violated the law. *Id.*

In July 2013 (the same month the trustee filed the complaint against Heupel), Heupel Law voluntarily provided checks refunding the full amounts of the post-petition payments to Mr. Nielsen and Ms. Paysinger. 4 BR 112-13, 146. However, on the advice of counsel, they did not cash the refund checks. *Id.*; 3 BR 288.

The bankruptcy court consolidated Ms. Paysinger and Mr. Nielsen's cases with the trustee's case, and they remained consolidated with the trustee's case until the Atzbachs asked the court to bifurcate their cases, and the court granted their requests on January 15, 2014. 1 BR 156, 158.

The parties in Ms. Paysinger and Mr. Nielsen's cases conducted discovery until Mr. Heupel filed his own Chapter 11 bankruptcy case in May 2014 (attempting to reorganize his substantial debts), which stayed the proceedings against him personally but not against Heupel Law.  2 BR 15.  However, Mr. Heupel eventually agreed to let the cases against him personally proceed.  In August 2014—roughly a year after Heupel Law tendered the refund checks that the Atzbachs counseled Ms. Paysinger and Mr. Nielsen not to cash, and roughly 20 months after the trustee began investigating Mr. Heupel and Heupel Law—Mr. Heupel and Heupel Law conceded liability for willful violations of the automatic stay provision of the bankruptcy code.  2 BR 24-26.  The only remaining issue before the court was damages.

In the meantime, discovery also continued in the trustee's case.  In November 2014, the trustee and Heupel agreed to a preliminary settlement where Mr. Heupel would repay $424,000 in fees to clients.  *See* Mot. Approve Stipulation, *Layng v. Heupel,* No. 13-00005-EEB (Bankr. D. Colo. filed Nov. 3, 2014) (ECF No. 58); BR 335-47.  However, the agreement was subject to the approval of the bankruptcy court that was presiding over Mr. Heupel's voluntary chapter 11 petition.  *Id.*  The bankruptcy court ultimately dismissed the chapter 11 petition and declined to convert it into a chapter 7 case.  *See* Order Dismissing Chapter 11 Case, *In re Kevin Dean Heupel*, No. 14-16337-MER (Bankr. D. Colo. filed April 22, 2016) (ECF No. 220).  Thus, the $424,000 settlement was not approved and that case remains pending.  *Id.*

7

In November 2014, the Atzbachs filed their first fee affidavits.  Their fees at that point already totaled over $35,000.  2 BR 102-110.  After a two-day hearing on damages, their fees exceed $72,000.  3 BR 289.

At the damages hearing, the Atzbachs both testified, as did Ms. Paysinger and Mr. Nielsen.  Mr. Heupel also testified.  After hearing the testimony and considering the evidence, the bankruptcy court first found, as Heupel had conceded, that Heupel had willfully violated the automatic stay provisions, a prerequisite to imposing sanctions under § 362(k).

The bankruptcy court then found that other than attorneys' fees and costs, Ms. Paysinger and Mr. Nielsen suffered only "minimal" damages.  Their damages were the post-petition bank withdrawals of $661.77 and $400, respectively, as well as the costs and lost wages associated with attending the two-day hearing.  3 BR 292-93.  In total, the bankruptcy court concluded that the non-attorney fees related damages were $1,080.77 for Ms. Paysinger and $747.00 for Mr. Nielsen.  3 BR 293.

As for attorney's fees and costs, the bankruptcy court significantly reduced the Atzbach's fee request.  The bankruptcy court found that "[f]rom the very beginning of this litigation, the Atazbachs [sic] have demonstrated that their motivation in pursuing this litigation was not limited solely to vindicating the rights of Ms. Paysinger and Mr. Nielsen."  3 BR 294.  The bankruptcy court found it was "apparent" that "the Atzbachs, who were rivals of the Firm in a very competitive consumer bankruptcy market, wanted to put an end to the Firm's zero-down bankruptcy program and to punish Mr. Heupel for what they viewed as

8

unethical and illegal conduct." *Id.* The bankruptcy court observed that the Atzbachs spent "significant hours" putting together evidence not relevant to Ms. Paysinger and Mr. Nielsen's cases, but instead related to what the Atzbachs viewed "as the illegalities of the entire zero-down program," even though the United States Trustee was already pursing relief against Heupel on behalf of the hundreds of other debtors. *Id.*

The bankruptcy court based its conclusion in part on testimony from the Atzbachs themselves. For instance, Geoffrey Atzbach testified on "multiple occasions that the practices of the Firm and Mr. Heupel 'deeply offended' and 'disturbed' him and that he felt 'embarrassed' and 'indignant' as a member of the bar." *Id.* He admitted he "took the matter personally" and that the litigation "'consumed his life for quite a while.'" 3 BR 294-95. He also acknowledged that he did not follow his normal practice and call Mr. Heupel and try to resolve the matter out of court when he learned of stay violations. 3 BR 295. Instead, he was "'dumbfounded and aghast' at the 'scope and breadth' of Mr. Heupel's conduct and felt it needed to be addressed to the court in a 'very public way.'" *Id.* Erik Atzbach's testimony revealed that he "agreed with his brother's reasons for litigating these cases," "wanted the conduct addressed in a public manner, and spent so much time on these cases that it hurt both his business and his marriage." *Id.*

Based on their testimony, the bankruptcy court concluded that:

> In essence, the Atzbachs seemed on a personal crusade to publicly air
> their grievances against Mr. Heupel. These personal motivations
> caused them to bill an unreasonable amount to time [sic] to these

> matters. The Court is cognizant that proof of the [Heupel Law's] conduct in other cases had some relevance to establishing punitive damages in these individual cases.  However, the Atzbachs billed time well in excess of what was required to show the Firm's standard practices. Moreover, much of the work they expended was duplicated by the [United States Trustee].  Indeed that is why this Court initially consolidated these cases into the Miscellaneous Proceeding.  Although the Debtors acted within their rights to seek their individual damages outside of the Miscellaneous Proceeding, those individual rights did not give the Atzbachs the license to bill excessive amounts in an attempt to expose all purported wrongdoings of the Firm and Mr. Heupel.

*Id.*  The court also explained that it would "not go so far as to say this was a profit-making venture for the Atzbachs, but the idea that Mr. Heupel would ultimately foot the bill for the litigation was certainly a factor."  *Id.*  Additionally, the court found that the "Atzbachs' excessive fees and desire for public castigation of Mr. Heupel and [Heupel Law] also influenced their willingness to settle."  3 BR 296.

Finally, the court concluded that the Atzbach's lack of litigation experience substantially inflated their billing.  The court concluded that the Atzbachs spent far more time than necessary preparing the motion for an order to show cause and the reply, as well as preparing for what should have been a simple hearing on damages. *Id.*  Based on these factors, the court imposed an across the board reduction of 40% on all of the Atzbachs' fees and 60% and 75%, respectively, on the show cause briefing and the damages hearing.  *Id.*  The court awarded a total of $27,512.88 in attorneys' fees, plus costs of $786.28, for a total of $28,299.16.  *Id.* at 297.

The bankruptcy court also awarded modest punitive damages under § 362(k). After weighing the relevant factors, the court awarded $2,000 in punitive damages to each debtor. 3 BR 300. Heupel appealed the attorneys' fee award and the punitive damages award. The debtors moved to consolidate their appeals without opposition, *see* Mot. Consol. Cases, ECF No. 32, and this Court granted their request, *see* Order, ECF No. 33.

While this appeal was pending, the Colorado Supreme Court suspended Mr. Heupel from the practice of law for one year and one day pursuant to a stipulation with Mr. Heupel. 3 BR 315-22. The suspension was based on Mr. Heupel's conduct related to the zero-down program. *Id.*

## II.  Jurisdiction and Standard of Review

Mr. Nielsen elected to proceed in the United States District Court as the forum for appellate review pursuant to 28 U.S.C. § 158(c)(1)(B). Accordingly, this Court has jurisdiction under 28 U.S.C. § 158(a).

Neither party in this appeal cites the correct standard of review. Heupel argues for de novo review of all issues before this Court, citing *In re Diviney*, 225 B.R. 762, 769 (10th Cir. BAP 1998). *Diviney*, however, specifically holds that "an award of sanctions for a violation of the automatic stay is reviewed for an abuse of discretion." *Id.* "Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Pandit v. Am. Honda Motor Co., Inc.*, 82

F.3d 376, 379 (10th Cir. 1996) (quoting *Boughton v. Cotter Corp.*, 65 F.3d 823, 832 (10th Cir. 1995)).  Moreover, a reviewing court reviews the factual determinations of the bankruptcy court under the clearly erroneous standard; only conclusions of law are reviewed de novo.  *In re Market Ctr. E. Retail Prop.*, 730 F.3d 1239, 1244 (10th Cir. 2013).  Despite this controlling law, Mr. Nielsen and Ms. Paysinger fail to address the correct standard of review in their brief and do not dispute Heupel's assertion that de novo review applies.

Although the parties all failed to cite the correct standard of review, I decline to decide this appeal under the wrong standard and instead apply the standards described above.  In addition, on appeal, "[t]he burden of proof is on the party seeking to reverse a bankruptcy court's holding."  *In re Van Vleet*, 461 B.R. 62, 68 (D. Colo. 2010) (quotation omitted).

## III.  Analysis

The automatic stay provision of the Bankruptcy Code prevents creditors from taking actions to collect a debt from a debtor who has filed for bankruptcy.  *See* 11 U.S.C. § 362(a).  This stay provision "has been described as one of the fundamental debtor protections provided by the bankruptcy laws."  *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (quotation omitted).  If a creditor willfully violates the stay, then an individual harmed by that violation "shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k).

Heupel does not dispute he willfully violated the stay based on his post-petition withdrawals from Ms. Paysinger's and Mr. Nielsen's accounts.  However, he argues that the bankruptcy court erred in awarding attorneys' fees and punitive damages.  As I describe below, I discern no error in the bankruptcy court's analysis and therefore reject Heupel's arguments.

A.    **Injury**

Heupel argues that, as a threshold matter, Mr. Nielsen and Ms. Paysinger did not demonstrate they were "injured" by the violation of the automatic stay. Thus, he argues that they cannot collect any other award under § 362(k), which only provides a remedy for "an individual injured by any willful violation of a stay."

This argument is inconsistent with Mr. Heupel and Heupel's Law's earlier "admission of liability" in these cases.  2 BR 25.  In any event, it fails on its merits because both Mr. Nielsen and Ms. Paysinger demonstrated that Heupel Law unlawfully took post-petition payments from their bank accounts and did not return them for some time.  They also incurred attorneys' fees litigating the stay violation, which qualifies as damages.  *See In re Gagliardi*, 290 B.R. 808, 820 (Bankr. D. Colo. 2003) ("Section 362(h) [now § 362(k)] states . . . that an individual injured by any willful violation of the automatic stay 'shall recover actual damages, *including costs and attorneys' fees.*'  The use of 'including' indicates that Congress considered fees as an example of actual damages by itself." (citations omitted)).  Accordingly, I reject the argument that the debtors did not demonstrate they were injured by the automatic stay violation.

13

**B.      Contingency Fee Agreement**

As an alternative argument, Heupel argues that Mr. Nielsen and Mr.

Paysinger were not actually liable for attorneys' fees because they signed

contingency-fee agreements with the Atzbachs.  As a result, Heupel contends the

Atzbachs' fees are not "actual damages" under § 362(k).

Section 362(k) is not a fee-shifting provision.  Instead, it permits debtors to

recover "actual damages," including attorneys' fees.  Because of the unique

language of § 362(k), courts have disallowed fees where the debtor was represented

pro bono and by a legal aid organization, reasoning that the debtor had not actually

incurred any damages where no fees were owed.  *See In re Dean*, 490 B.R. 662, 671

(Bankr. M.D. Pa. 2013) (finding that debtor represented by pro bono counsel "failed

to prove that she incurred attorneys fees as actual damages"); *In re Hedetneimi*,

297 B.R. 837, 843 (Bankr. M.D. Fla. 2003) (finding that debtor represented by legal

services agency not entitled to recover attorneys' fees as actual damages); *accord In*

*re Gagliardi*, 290 B.R. at 820 (reasoning that the language of § 362(k) "indicates

that Congress considered fees as an example of actual damages by itself").

As a threshold matter, it is not clear that the debtors actually signed

contingency fee agreements with both Atzbachs.  Mr. Nielsen and Ms. Paysinger

clearly signed hybrid contingency-fee agreements with Erik Atzbach, which provided:

> Out of the total recovery amount, [Erik B. Atzbach, LLC, ("EEB")]
> shall receive and retain as compensation for its services (the "EEB
> Fee"):
>> a.      An amount equal to the fees it has earned on the case at
>>         its hourly rate of $300/hour.

14

b.   However, in no case shall the amount retained by EEB in respect of its fees earned on the Cases be less than forty-nine percent (49%) of the total recovery amount.

c.   In addition, EBA shall retain the full amount of any costs or expenses actually advanced by EEB.

2 BR 111, 113.  The agreements were dated March 20, 2013.  However, the nature of the fee agreement with Geoffrey Atzbach is less clear.  Mr. Nielsen and Ms. Paysinger signed separate fee agreements with Geoffrey Atzbach, who joined their cases sometime after they retained Erik Atzbach.  2 BR 115-16.  These agreements purport to be effective as of "March 20, 2012," a almost year *before* Mr. Nielsen and Ms. Paysinger met either Atzbach.  *Id.*  This may well be a clerical error, but there was no testimony to that effect.  On their face, the Geoffrey Atzbach fee agreements, which are partially redacted, do not appear to be contingency agreements.  The Atzbachs contend they are not.  Response at 11, ECF No. 27.  However, the bankruptcy court found that Ms. Paysinger and Mr. Nielsen entered into contingency agreements with *both* Atzbachs.  3 BR 295.  Consequently, the court concluded that the "[d]ebtors are not responsible for paying those fees out-of-pocket since they retained the Atzbachs on a contingency basis."  3 BR 298.

I need not determine whether the bankruptcy court erred when she concluded the debtors signed contingency fee agreements with Geoffrey Atzbach.  Either way, the debtors are "responsible" for paying the Atzbachs' fees, even if they are not responsible for paying the fees out-of-pocket.  Indeed, one court that disallowed fees under § 362(k) based on a pro bono fee agreement specifically distinguished contingency fee agreements.  The court advised that:

15

> [i]f they proceed carefully, [pro bono counsel] can preserve a fee claim
> under § 362(k) while assuring the client that he will not have to pay
> that fee. Thompson's attorneys could have entered into a clear written
> agreement providing that the fees were to be due from him but
> contingent upon success of the appeal and collection from GMAC. By
> doing so, they could have eliminated Thompson's risk of payment while
> also ensuring that Thompson actually incurred damages in the form of
> attorneys' fees that were due from the client . . . .

*In re Thompson*, 426 B.R. 759, 767 (Bankr. N.D. Ill. 2010).  As the reasoning of the

*Thompson* court makes clear, there is a distinction between a complete lack of

responsibility for paying any attorneys' fees—which prevents recovery under §

362(k)—and a lack of responsibility for paying fees out of pocket—which does not.

Accordingly, even if the debtors entered into contingency fee agreements with both

Atzbachs, they are responsible for paying fees.  I therefore reject Heupel's argument

that the Atzbachs' fees are not recoverable under § 362(k) based on the contingency-

fee agreements.

## D.    Reasonableness of Fees

Heupel argues that the fees awarded were unreasonable in light of the small

amount of damages at issue.  While I may well have come to a lower figure were I

deciding the issue de novo, Heupel points to no evidence that the bankruptcy court

abused its discretion by awarding a total of $28,299.16 in attorneys' fees and

costs—an amount far less than the initial request of over $72,0000.  And when

applying the abuse of discretion standard, I defer to the bankruptcy court in part

because of "its first-hand ability to view the witness or evidence and assess

16

credibility and probative value." *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).

The bankruptcy court extensively discussed why its award was appropriate. It multiplied the hours counsel reasonably spent on the litigation by a reasonable hourly rate to arrive at the "lodestar" figure. 3 BR 293 (citing *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005). It also disallowed any unnecessary, irrelevant, or duplicative work, and took into account other factors relevant to the lodestar analysis: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 3 BR 293 (citing *In re Market Ctr. E. Retail Prop., Inc.*, 730 F.3d 1239, 1246-47 (10th Cir. 2013).

The court explained its reasons for substantially discounting—but not disallowing—the fees. First, the court concluded the Atzbachs "wanted to put an end to the Firm's zero-down bankruptcy program and to punish Mr. Heupel for what they viewed as unethical and illegal conduct." 3 BR 294. Second, the court concluded the Atzbachs' personal motivations "caused them to bill an unreasonable amount" and also considered that much of the work was duplicated by the trustee.

17

3 BR 295.  Third, the court found that the Atzbachs billed far more than they would have had their clients been paying out of pocket.  *Id.*  Fourth, the court concluded the Atzbachs were reluctant to settle in part because of their "excessive fees" and their desire to publicly castigate Mr. Heupel and Heupel Law.  3 BR 296.   Finally, the court considered the Atzbachs' lack of litigation experience, which it concluded caused them to bill excessive hours.  *Id.*  However, the court also recognized that much of the work was still necessary and reasonable.  *Id.*  The motion for the show cause order and the reply were both filed before Heupel conceded liability, and a substantive reply was required because Heupel had argued his failure to file the reaffirmation agreements was isolated and inadvertent.  *Id.*  Once he conceded liability, the issues of damages was still unresolved and contested.  *Id.*

After its comprehensive discussion, the court reduced all of the Atzbachs' fees by 40%.  *Id.*  It further reduced two categories it found particularly excessive—the motions for an order to show cause and the damages hearing—by 60% and 75%, respectively.  *Id.*

Despite these large reductions, Heupel argues the amount the bankruptcy court awarded was unreasonable, relying in large part on the bankruptcy court's own findings regarding the Atzbachs' desire to discredit Heupel, their overzealousness, their inexperience in litigation, and their reluctance to settle even after the stay violations ceased.  But Heupel points to nothing suggesting the bankruptcy court abused its discretion by misapprehending the facts or misapplying the law.  While Heupel does argue certain types of entries should have been

18

disallowed, "the district court need not identify and justify every hour allowed or disallowed, as doing so would run counter to the Supreme Court's warning that a 'request for attorney's fees should not result in a second major litigation.'" *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996) (quoting *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1203 (10th Cir. 1986)).  Accordingly, the bankruptcy court did not abuse its discretion by awarding $28,299.16 in attorneys' fees and costs.

## C.   Fees Incurred After the Stay Violation Ended

Heupel also argues the debtors failed to adequately mitigate their damages by continuing to incur attorneys' fees after the stay violation ended, and the bankruptcy court erred by awarding fees that could have been avoided.  However, the bankruptcy court explicitly considered and discussed the fees incurred after the stay violation ended and reduced the fees that were redundant or improper.  3 BR 295-96.  Moreover, the issue of damages—including fees incurred up to that point—still needed to be resolved after the stay violation ceased.  3 BR 296.  Nevertheless, to account for the Atzbach's excessive billing, the court reduced fees from the damages hearing by 75%.  Heupel again points to nothing in the record that suggests the bankruptcy court failed to consider the appropriate factors or misapplied the law.  To the contrary, Heupel largely relies on the bankruptcy court's own findings—considerations it obviously took into account—to suggest that fees incurred after the stay violation ceased should have been disallowed.  This argument falls short of demonstrating that the bankruptcy court abused its discretion by rendering a decision that was "arbitrary, capricious or whimsical," an

19

"exercise of manifestly unreasonable judgment" or "the result of partiality,

prejudice, bias or ill-will as shown by the evidence or the record of proceedings." *In

re Bueno*, 248 B.R. 581, 582 (D. Colo. 2000).

## D.   Punitive Damages

Mr. Heupel also argues that his case was inappropriate for a punitive

damages award.  Because the bankruptcy court acted within its discretion in

awarding punitive damages, I reject this argument.

The bankruptcy court's well-reasoned and comprehensive opinion lists and

analyzes the relevant factors.  First, it correctly explains that punitive damages are

only available under § 362(k) in "appropriate circumstances," which include "where

a defendant has acted with actual knowledge that they were violating a federally

protected right or with reckless disregard of whether they were doing so."  3 BR 297

(citing *In re Diviney*, 225 B.R. at 776).  It then looked to the factors the *Diviney*

court discussed: (1) the nature of the defendant's conduct; (2) the defendant's ability

to pay; (3) the motives of the defendant; and (4) any provocation by the debtor.  *Id.*

After discussing the applicability of each of these factors, the bankruptcy court

concluded that in light of Mr. Heupel's widespread misconduct (that allowed him to

profit substantially from an unethical billing structure), the minimal harm to the

debtors, and the lack of provocation, a small punitive damages award was

appropriate.  3 BR 297-300.

Mr. Heupel essentially argues that the factors do not weigh strongly in favor

of punitive damages.  However, he points to no evidence suggesting the lower court

"made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Pandit*, 82 F.3d at 379 (quoting *Boughton*, 65 F.3d at 832). Accordingly, he has not carried his burden of demonstrating the bankruptcy judge abused its discretion in awarding a modest amount of punitive damages.

### E.    Judge Brown's Recusal

Heupel argues that the case should be remanded because Judge Brown *sua sponte* recused herself from this case while this appeal was pending.  In the order of recusal, Judge Brown explained that she "deems it would be improper for her to hear the within bankruptcy case" but provided no further elaboration.  *See* Order of Recusal, *In re Dane Anders Nielsen, In re Adia Janine Paysinger*, Nos. 12-36010 EEB, 12-35943 EEB (April 22, 2016) (ECF No. 292).  Judge Michael Romero, who presided over Mr. Heupel's chapter 11 case, was reassigned to the case.  Mr. Heupel then moved to set aside the judgments issued by Judge Brown, arguing that Judge Brown's unexplained recusal raised questions of her impartiality in earlier decisions.  Judge Romero denied the request.  *See* Order, *In re Dane Anders Nielsen, In re Adia Janine Paysinger*, Nos. 12-36010 EEB, 12-35943 EEB (May 9, 2016) (ECF No. 305).

Mr. Heupel did not file a notice of appeal from Judge Romero's decision, which was issued after he filed his notice of appeal in this case.  *See* Def'ts Notice of Appeal, ECF No. 3 (filed January 12, 2016).  Because there is no effective notice of appeal as to the recusal motion, this Court lacks jurisdiction to consider it on appeal.  *See United States v. Ortiz*, 741 F.3d 288, 292 (1st Cir. 2014) (holding post-

judgment motion was not properly before the court where appellant failed to file a new or amended notice of appeal).

Even if this Court were to construe the argument—raised for the first time before this Court in the reply—as a motion for relief under Fed. R. Bankr. P. 8013(a) and consider it on its merits, it would fail because there is no evidence suggesting Judge Brown should have recused herself earlier.

"Any justice, judge, or magistrate judge of the United States shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Section 455(a)'s recusal requirement arises *sua sponte* when the judge's impartiality might be reasonably questioned. *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000). "The trial judge must recuse himself when there is the appearance of bias, regardless of whether there is actual bias." *Bryce v. Episcopal Church*, 289 F.3d 648, 659 (10th Cir. 2002). Under this standard, Judge Brown's obligation to recuse herself may well have arisen after she entered judgment in this case. Moreover, Heupel provides no evidence to suggest that something should have compelled Judge Brown to recuse herself before she did. *See Hill v. Schilling*, 593 Fed. App'x 330, 334 (5th Cir. 2014) (unpublished) (denying relief where judge recused herself without providing an explanation after entering judgment). Additionally, Judge Brown was not required to provide any explanation for her recusal. *See id.* Accordingly, nothing in the record suggests that remand is appropriate.

22

**F.     Other Pending Motions**

In examples of the Atzbachs' overzealous litigation of this case—and perhaps

their litigation inexperience—the Atzbachs filed various motions while this appeal

was pending.  First, they filed a motion to dismiss this case after Mr. Heupel was

suspended from the practice of law because Heupel Law was no longer represented

by an attorney, as required under the federal rules.  *See* Mot. Dismiss Appeal (ECF

No. 14, Nielsen, No. 16-cv-00081-LTB; ECF No. 16, Paysinger, No. 16-cv-00082-

LTB).  However, Heupel Law quickly retained counsel after Mr. Heupel's

suspension.  *See* Notice of Entry of Appearance (ECF No. 18, Nielsen, No. 16-cv-

00081-LTB; ECF No. 20, Paysinger, No. 16-cv-00082-LTB.  I thus DENY that

motion as moot.  Second, they filed a Motion to Correct the Record on Appeal (ECF

No. 21, Nielsen, No. 16-cv-00081-LTB; ECF No. 23, Paysinger, No. 16-cv-00082-

LTB), which did not actually request any record correction, but instead complains

that Heupel only transcribed and submitted certain portions of the damages

hearing rather than the entire hearing.  As the appellant, Heupel was not obligated

to transcribe the complete hearing.  Instead, Heupel may choose what proceedings

to transcribe.  *See*  Fed. R. Bankr. P. 8009(b)(1)(A) (directing appellant to submit

"transcript of such parts of the proceedings not already on file as *the appellant*

*considers necessary* for the appeal").  If the appellant fails to transcribe necessary

and relevant proceedings, he likely will not carry his burden of demonstrating the

bankruptcy court erred.  *See In re Van Vleet*, 461 B.R. at 68.  But an Appellee

cannot compel an Appellant to transcribe additional portions of the record and

submit them.  I thus DENY the Motion to Correct the Record on Appeal (ECF No. 21, Nielsen, No. 16-cv-00081-LTB; ECF No. 23, Paysinger, No. 16-cv-00082-LTB).

### E.      Attorneys' Fees on Appeal

The Atzbachs ask for attorneys' fees for the cost of defending this appeal. Given the mandatory language of § 362(k), I remand this case with an instruction to award *reasonable* attorneys' fees and costs for defending this appeal.

## IV.  Conclusion

For the reasons described above, I AFFIRM the bankruptcy court's decision. I DENY as moot the debtors' Motion to Dismiss Appeal (ECF No. 14, Nielsen, No. 16-cv-00081-LTB; ECF No. 16, Paysinger, No. 16-cv-00082-LTB).  I DENY the debtors' Motion to Correct the Record on Appeal (ECF No. 21, Nielsen No. 16-cv-00081-LTB; ECF No. 23, Paysinger, No. 16-cv-00082-LTB).  I REMAND the case to the bankruptcy court for the limited purpose of awarding the debtors their reasonable attorneys' fees and costs incurred in defending this appeal under § 362(k).

BY THE COURT:

  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

DATED: January 4, 2017